For the above reasons, the instant petition for relief under § 2255 is denied.

Maurice SHACKET and Sylvia
Shacket, Plaintiffs,

v.

ROGER SMITH AIRCRAFT SALES,
INC., et al., Defendants.

PHILKO AVIATION, INC.,
Counterplaintiff,

v.

Maurice SHACKET and Sylvia Shacket,
Counterdefendants.

Maurice SHACKET and Sylvia Shacket,
Third Party Plaintiffs,

v.

CLARK AVIATION, INC., et al., Third
Party Defendants.

No. 78C4284.

United States District Court,
N.D. Illinois, E.D.

Nov. 20, 1986.

Memorandum Opinion and Order
Dec. 29, 1986.

On Motion to Dismiss Jan. 13, 1987.

James C. Murray, Jr., James E. Hanlon, Jr., Katten, Muchin, Zavis, Pearl, Greenberger & Galler, Chicago, Ill., for plaintiffs.

Leslie R. Bishop, Donald B. Garvey, Michael E. Kerpan, Jr., Bishop & Crawford, Ltd., Oak Brook, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

This action was brought by Maurice and Sylvia Shacket (Maurice is referred to individually as "Shacket," and they are referred to collectively as "Shackets") for a declaratory judgment that they have title to a 1978 Piper Navajo registered as N78MS (the "Aircraft"). Philko Aviation, Inc. ("Philko") counterclaims on a conversion theory,[1] asserting lawful ownership of the Aircraft. This action, on remand from the Supreme Court, 462 U.S. 406, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983), poses some if not all of the following issues:

1. whether Philko had statutory "actual notice," within the meaning of Federal Aviation Act § 503(c) (49 U.S.C. § 1403(c)), of the fraudulent scheme of Roger Smith ("Smith") and Roger Smith Aircraft Sales ("Smith Aircraft") to ob-

tain money by dealing with more than one party with respect to the Aircraft;

2. for that purpose, whether statutory "actual notice" can be imputed to Philko by virtue of the relationship between it on the one hand and Smith and Smith Aircraft on the other;

3. whether the instruments purporting to convey the Aircraft to Philko were valid under Illinois law;

4. whether those instruments conveyed valid title to Philko when it had no intention of taking possession and ownership of the Aircraft;

5. whether Philko's interest is valid over Shackets' interest when, at the time Philko recorded its interest, it had knowledge of Shackets' interest; and

6. whether Shackets exercised reasonable diligence to record their interest in the Aircraft.

This Court has conducted a nine-day bench trial (the "Trial"), during which it had the opportunity to hear live testimony and review exhibits, stipulations of fact and designations of deposition transcripts. In accordance with Fed.R.Civ.P. ("Rule") 52(a), this Court finds the facts specially as set forth in the following Findings of Fact ("Findings") and states the following Conclusions of Law ("Conclusions"). To the extent, if any, the Findings as stated reflect legal Conclusions, they shall be deemed Conclusions; to the extent, if any, the Conclusions as stated reflect factual findings, they shall be deemed Findings.

### Findings of Fact

1. Shackets are citizens of Michigan residing in Southfield, Michigan. Shacket has been a pilot for many years and has owned a variety of private aircraft since 1955, for the most part together with one of his employees, Joseph Henry Charbonneau ("Charbonneau"). Charbonneau always took responsibility for handling all paperwork, including title documents, relating to ownership of the aircraft he owned jointly with Shacket.

---

1. Though for some reason its Amended Counterclaim (the "Counterclaim") does not appear to be in the court file, it is set out in full in

Shacket's reply filed the first day of the Trial referred to in the text, June 2, 1986.

2. Philko is a Delaware corporation with its principal place of business within the Northern District of Illinois. At all relevant times it has been duly licensed to transact business in the State of Illinois.

3. From a date prior to April 1977 through December 1, 1977 Smith Aircraft was an Illinois corporation. Beginning approximately April 28, 1977 Smith Aircraft had its principal (indeed its sole) place of business at the Aurora Municipal Airport in Sugar Grove, Illinois (the "Airport"). On or about December 1, 1977 Smith Aircraft was involuntarily dissolved by the Illinois Secretary of State. Thereafter Smith continued to carry on Smith Aircraft's activities at the same location in the same corporate name despite such dissolution.

4. At all relevant times Smith, an Illinois citizen, was the sole owner and president of Smith Aircraft. Smith has been in the aircraft business for over 20 years. Until April 1977 Smith Aircraft was a fixed base operator ("FBO") at DuPage County Airport. As an FBO, Smith Aircraft leased and sold new and used aircraft, operated a flight school and a charter service and provided aircraft maintenance services.

5. Before April 22, 1977 Harry Weber ("Weber") was the sole owner of Philko Aviation, Inc., an Illinois corporation ("Philko Illinois"). Philko Illinois was then an FBO operating out of the Airport, engaging in all the same kinds of activities then conducted by Smith Aircraft at the DuPage County Airport, as well as in the sale of aviation fuel and lubricants. Philko Illinois conducted its operations at the Airport pursuant to a lease with the City of Aurora.

6. In December 1976 Smith approached Weber as to the potential acquisition of Philko Illinois. They discussed the terms, including the purchase price, of that possible acquisition. Because Smith was not himself financially capable of acquiring Philko Illinois, Smith then approached Illinois citizen Edward McArdle ("McArdle"), president of McArdle Ltd. (McArdle's holding company for ownership of various business subsidiaries), with the idea that McArdle or one of his companies would purchase Philko Illinois and would in turn lease the facilities operated by Philko Illinois to Smith Aircraft. Smith's testimony during the trial clearly disclosed he had not then thought through the economics of the transaction or just how it would function— his mistaken perception was that Smith Aircraft would be able to fund, out of future operations, its financial obligations incurred in acquiring the business.

7. McArdle, an experienced businessman with a wide variety of holdings, calculated the amount of investment he or his company would be required to make to acquire Philko Illinois and the amount of yield he would want to justify that investment. Based on his analysis he told Smith the required monthly rental from Smith Aviation to McArdle or his company would be $4,000 absolutely net (that is, free and clear of any expenses), and he asked if Smith Aircraft could handle that amount of rent. Smith responded Smith Aircraft could: It was already paying about $3,200 per month at DuPage Airport, with fewer spaces for aircraft tiedowns and without having any right to make fuel sales. What Smith (obviously a far less experienced businessman than McArdle) did not realize was that he had failed to take into account the added financial burdens imposed by (a) the lease (a net lease, with the tenant required to bear all the burdens of ownership), (b) the payments on Weber's noncompetition agreement (see Findings 8 and 9) and (c) the need to build up a replacement inventory of parts (see Finding 12) at the same time that Smith Aircraft was required to pay off its account payable for the original parts inventory to McArdle or his company. From the outset Smith Aviation was hopelessly undercapitalized for the needs of the FBO transaction at the Airport. Though McArdle may not have fully realized that when the transaction was consummated, Philko's personnel (who maintained the financial records of Smith Aircraft's operations at the Airport) certainly became aware of that fact long before the transaction involving the Aircraft, and not later than the end of 1977 McArdle

himself also became aware of Smith Aircraft's financial difficulties when Smith had to ask McArdle for still further financing (provided by Pheasant Run, another of McArdle's companies).

8. On April 21, 1977 McArdle caused McArdle, Ltd. to organize Philko as a wholly-owned subsidiary. On April 22 Philko contracted to purchase all the common stock of Philko Illinois for $141,600, subject to certain adjustments that brought the total purchase price over $200,000. In part the purchase agreement obligated Philko to assume the obligations of Philko Illinois under the City of Aurora lease at the Airport. Through the agreement and the subsequent dissolution of Philko Illinois (which caused its assets to be transferred to Philko), Philko acquired an inventory of aircraft, aviation fuel, replacement parts and sundry items associated with an FBO operation. Contemporaneously with execution of the purchase agreement, Philko also contracted to pay Weber an additional $50,000, in monthly installments over the course of five years, under a noncompetition agreement.

9. On April 28 Philko and Smith Aircraft entered into a five-year agreement (the "Lease") with a variety of provisions—both usual and unusual in conventional leasing arrangements. In addition to its $4,000 monthly net rental obligation to Philko, Smith Aircraft assumed (a) all Philko's obligations (formerly those of Philko Illinois) under the City of Aurora lease and (b) Philko's payment obligations under the Weber noncompetition agreement. All Philko employees became employees of Smith Aircraft as of April 28. Smith Aircraft was required to and did maintain insurance for the operations, naming Philko as a co-insured. Smith Aircraft further agreed to operate in Philko's name various of the businesses previously conducted by Philko Illinois: the purchase (also in Philko's name) and sale of aviation fuel and lubricants, the sale of new Piper aircraft,

the leasing of aircraft, the operation of a charter school and flight school and the rendering of aircraft maintenance services. Indeed the only activity the Lease permitted Smith Aircraft to carry on in its own name was the purchase and sale of used aircraft. Though labeled a lease, the transaction in substantial part rendered Smith Aircraft an agent for Philko. And as later Findings reflect, the manner of actual operation of the Airport-based business after the McArdle acquisition of Philko Illinois and the entry into the Lease created an even closer linkage between Smith and Smith Aircraft on the one hand and McArdle and Philko on the other than was required under the Lease. Each of the matters identified in Findings 10–13 bespeaks a relationship far different from the purely arm's length one Philko has sought to portray during this litigation. It is impermissible for Philko, given that relationship and its possession of information as to Smith Aircraft's troubled finances, to assert its entry into the transaction relating to the Aircraft was that of a bona fide purchaser or bona fide lender without notice.

10. At the request of Anastasios Agnos ("Agnos"), McArdle's controller and treasurer, Smith initially verified the values of the used aircraft acquired by Philko through its transaction with Philko Illinois. From time to time thereafter while Smith Aircraft continued its FBO operation at the Airport, it bought and sold aircraft on behalf of Philko, including the used aircraft acquired by Philko in its acquisition of Philko Illinois. Smith signed bills of sale for those aircraft as Vice President of Philko, though he was not an elected officer of Philko. Neither McArdle nor Agnos signed bills of sale for Philko aircraft sold by Smith, although both knew of such sales. Philko therefore necessarily knew of Smith's thus holding himself out as a Philko officer,[2] but Philko made no objection or complaint in that respect.

---

**2.** Philko's response to Shackets' proposed Finding 12 says "[n]either McArdle nor Agnos was aware of Smith's use of such title, but they were aware that Smith Aircraft was handling the sale

of inventory aircraft on Philko's behalf, pursuant to the parties' agreement." That is disingenuous. All the inventory aircraft were titled to Philko. Just how was title to be conveyed to a

11. Despite Smith Aircraft's nominally independent status as FBO and as lessee under the Lease, in accordance with the Lease terms all funds received by Smith Aircraft for activities required to be carried on in Philko's name were deposited into an account in Philko's name at the Sugar Grove Bank. Philko had full control over the funds in that account. Under the Lease Philko was permitted to retain from those deposits an amount sufficient to cover the cost of the fuel sold, the taxes and other payments due to the City of Aurora and other expenses incident to cash sales, together with the $4,000 monthly rental owed to Philko by Smith Aircraft. Any remaining balance of such funds was supposed to be remitted to Smith Aircraft and accounted for via monthly operation reports, but such payments to Smith Aircraft were not in fact made regularly or on a timely basis. In any case, Philko's control of Smith Aircraft's operating receipts kept it fully informed as to the continuing deterioration of Smith Aircraft's financial condition (the inevitable result of its improvident deal with McArdle and its undercapitalization, see Finding 7).

12. Smith Aircraft was also given the right under the Lease, in conducting its aircraft maintenance and repair operations, to utilize the parts inventory Philko had purchased from Philko Illinois. Because Smith Aircraft was supposed to pay Philko for that inventory as it was used, it did not represent an initial capital requirement on the part of Smith Aircraft, but Smith Aircraft's need to maintain a parts inventory necessitated replacement of the initial inventory as it was used up—another cash outlay Smith had not thought through at the outset. Smith Aircraft did not in fact pay for the inventory on an ongoing basis. Instead, on the books maintained by Philko covering its operations and its relationship with Smith Aircraft, the entire value of the inventory was booked as an account receivable from Smith Aircraft.

purchaser, except by Smith (who had been entrusted with possession of the title documents) acting in some authorized capacity on Philko's behalf? Certainly Philko put Smith into a posi-

13. At the time the Lease was executed, McArdle personally guaranteed $100,000 of Smith Aircraft's line of credit with Commercial Credit Equipment Corporation ("CCEC"). Months later, after Smith Aircraft found itself in substantial financial difficulties as a result of the improvident transaction it had entered into with Philko, Smith sought further financial assistance from McArdle. On December 19, 1977 McArdle caused another McArdle, Inc. subsidiary, Pheasant Run, to lend Smith Aircraft $80,000 to repay a loan from the Downers Grove National Bank to Smith Aircraft (a loan the bank was unwilling to renew). That loan from Pheasant Run, due to mature in six months, was secured by the personal guaranties of Smith and his wife and by their pledge of the stock of Smith Aircraft. Upon McArdle's demand $20,000 of that $80,000 loan was repaid by Smith Aircraft in early April 1978, and McArdle was also then and thereafter pressing for payment of the $60,000 balance.

14. By early 1978 Smith Aircraft was in perilous financial condition. Philko, which was maintaining the books and records of the FBO operations at the Airport (see Finding 11), was fully aware of Smith Aircraft's inadequate cash flow. And as already indicated, Philko was also aware of Smith Aircraft's topheavy burden of indebtedness—as well as its lack of substantial noncash assets. In sum, Philko was clearly in possession of sufficient adverse information as to Smith Aircraft's financial situation as to put it on inquiry when confronted with any proposed transaction with suspicious or out-of-the-ordinary-course-of-business aspects.

15. Shackets also seek to draw unfavorable inferences from some of the irregularities disclosed by Philko's recordkeeping as to Smith Aircraft. For example, Shackets' proposed Finding 18 accurately states:

tion to do exactly what he did, and the assertion that neither McArdle nor Agnos individually observed him doing so is quite irrelevant.

As reflected in the books and records of Philko Aviation, Smith Aircraft was designated as an affiliate of Philko Aviation and Smith Aircraft was also designated as a manager for Philko Aviation.

Though such treatment does not bear the full weight Shackets seek to attribute to it, what it does confirm once again is the unconventional and hybrid nature of the Philko-Smith Aircraft relationship—a relationship Philko's personnel could not comfortably fit into the established categories in their computer program for accounting purposes. Although Smith Aircraft and Philko were not partners as Shackets contend, this Court credits Smith's testimony that McArdle led him to believe Smith could become a 50% shareholder in Philko once (a) Smith Aircraft had completed all the noncompetition payments to Weber, (b) McArdle had effectively recouped the cost of his acquisition of Philko (including a theoretical interest payment on that investment) through the payments of net rent under the Lease and (c) Smith Aircraft had paid Philko for the aircraft parts inventory acquired from Philko Illinois. This Court credits McArdle's contrary testimony only to the extent he denied having made any firm contractual commitment to that effect. What controls for current purposes is that so many aspects of the transactions between the parties reflect much less than an arm's length relationship—instead, Philko and Smith Aircraft clearly had a relationship that would also put Philko on inquiry under the circumstances referred to in Finding 14 and related prior Findings.

16. On or about November 7, 1977 Shackets entered into a written contract with Smith Aircraft for the purchase of the Aircraft (1978 Piper Navajo Serial No. 31–7812074) for a stipulated price of $289,781, payable by the trade-in of the plane then owned by Shackets plus $126,000 in cash. At that time Shackets paid Smith Aircraft a $20,000 deposit towards the purchase price. That contract was entered into in Southfield, Michigan, with Smith Aircraft sales manager Roy Levitt signing on behalf of Smith Aircraft.

17. Because it was not an authorized Piper dealer, in December 1977 Smith Aircraft placed Shackets' order with authorized dealer Clark Aviation, Inc. ("Clark Aviation"). Ultimately the price Smith Aircraft agreed to pay to Clark Aviation was $238,579 (the Aircraft's wholesale cost plus a $2,500 profit plus the $350 delivery fee payable to Piper distributor North States Aviation, Inc. ("North States")). Smith Aircraft paid $2,500 upon placing the order for the Aircraft, later paid another $5,000 and still later sent Clark Aviation a check (which proved to be NSF) in the amount of $25,000.

18. In December 1977 Shackets requested of Smith Aircraft that a special N number be assigned to the Aircraft (N numbers serve to identify aircraft and thus function much as a license plate does for a car). N numbers usually consist of a combination of five or six digits or alphabet characters following the letter N. Shackets instead requested N78MS, a special N number much like a vanity license plate. On January 13, 1978 Roy Levitt of Smith Aircraft wrote Shackets the Federal Aviation Administration ("FAA") had reserved the requested N number for the Aircraft.

19. Sometime in December 1977 Shackets learned from North States that Smith Aircraft had placed the order for the Aircraft through Clark Aviation. Shacket telephoned Clark Aviation's President Kenneth Rittenhouse ("Rittenhouse") to inquire about modifications to the original order. That was Shacket's first communication with Rittenhouse.

20. As part of the agreed-upon purchase price for the Aircraft, in March 1978 Shackets delivered their 1972 Piper Navajo B (with registration number N72MS) to Smith Aircraft. At the time of that delivery, Shackets did not deliver a bill of sale for N72MS to Smith Aircraft. Shackets later delivered that bill of sale to the purchasers of the 1972 Piper Navajo B.

21. Shacket spoke with Rittenhouse in about the second week of April 1978 to ask about the delivery date for the Aircraft. Rittenhouse then said he wanted to be

present at the closing between Shackets and Smith Aircraft, to make sure Smith Aircraft paid Clark Aviation at or before the closing (Rittenhouse had previously told Shacket that Smith Aircraft gave him a check that bounced). Shacket assured Rittenhouse he would inform him of the scheduled closing.

22. On April 17 Rittenhouse telephoned Shacket and told him the Aircraft was available to be picked up at the Piper factory in Lakeland, Florida. Smith Aircraft then told Shacket the Aircraft would be flown to the Airport and the closing would occur April 19.

23. On April 18 Piper issued a bill of sale for the Aircraft to North States, and North States in turn issued its bill of sale for the Aircraft to Clark Aviation. On or about April 19 Rittenhouse brought the Aircraft to Smith Aircraft at the Airport, and Clark Aviation executed and delivered its bill of sale for the Aircraft to Smith Aircraft, together with the other bills of sale referred to in this Finding. Contemporaneously with that delivery, Smith Aircraft paid $84,000 to Clark Aviation, leaving an unpaid balance of $147,079 owed to Clark Aviation.

24. Shackets had arrived at the Airport on April 19, the date of the scheduled closing. When Shackets first arrived at the Airport, the Aircraft was having a clock installed, which Smith said would delay the closing. Because it was late in the day, Shackets decided to stay overnight in Aurora and close the following day.[3]

25. On April 20 Shackets stood ready to close the purchase of the Aircraft. Because Smith was not prepared to close in the morning, he suggested Shackets have lunch and return to the Airport in the after-noon. At that time Shacket telephoned Rittenhouse to inform him the closing would be that afternoon. When Shackets returned to the Airport after lunch, they met Rittenhouse and Shacket asked Rittenhouse if it was okay to close the transaction. Rittenhouse responded it was (he did not tell Shacket Smith Aircraft had not yet fully paid for the Aircraft). Shacket then tendered two cashier's checks to Smith, one in the amount of $50,000 payable to Shacket and endorsed to Smith Aircraft and the other in the amount of $56,000 and payable to Smith Aircraft.

26. Smith told Shacket the title paperwork was not yet complete but he would "take care of the paperwork." Although Smith did not specifically refer to recording, Shacket understood Smith's comment to include that task. Shacket had never dealt with FAA recordings because such tasks were ordinarily handled by Charbonneau on their jointly-owned used aircraft. In fact, it was common practice in aircraft transactions for the dealer to handle the paperwork, including recording the title documents with the FAA—much in the same manner that automobile purchasers do not themselves handle the filing of their title transfer papers with the Secretary of State, leaving that to the dealer (Rittenhouse's testimony specifically confirmed that when Clark Aviation sells directly to customers rather than to dealers, Clark Aviation sends the documents to the FAA for registration, a procedure Rittenhouse termed "common practice"). It was reasonable for Shackets to rely on Smith Aircraft for that purpose. At the closing Shacket was given (a) two copies of the original purchase order marked "paid in full," (b) the pink carbon copy of the tempo-

---

3. There is considerable confusion in the record as to the specific date on which the Shackets closed their purchase of the Aircraft—Philko would have it that it took place April 19 rather than 20, in which event all the dates in this and the next several Findings would be one day earlier. That difference, however, would be wholly nonmaterial even if Philko's version were accepted. What *is* relevant is (a) that Shackets closed their purchase in reliance on Rittenhouse's assurance (an assurance that nec-essarily implied Smith Aircraft had the ability to convey good title to the Aircraft), (b) that Smith Aircraft in fact then had a good chain of title to the Aircraft and (c) that Shacket reasonably relied on Smith Aircraft to handle the FAA registration. All those things would be equally true on Philko's version of the dates (its disagreement as to the reasonableness of Shacket's reliance is a function of Shacket's conduct itself and not at all of the timing).

rary registration (valid for 90 days), (c) copies of the bills of sale from Piper to North States, North States to Clark Aviation and Clark Aviation to Smith Aircraft and (d) the original purchaser's copy of the bill of sale from Smith Aircraft to Shackets. Finally, Rittenhouse gave Shacket the Aircraft log and the warranty slips. Rittenhouse reviewed the operation of the Aircraft with Shacket and placed the pink temporary registration form in the Aircraft. Rittenhouse left the Airport that evening.

27. Shackets stayed overnight in Aurora because the Aircraft was not ready to be flown to Detroit. Next day (April 21) Shackets returned to the Airport and were told by Smith the paperwork was not yet complete. Rather than wait for whatever portions of the documentation were to be prepared for delivery to them, Shackets picked up the Aircraft and flew home to Detroit.

28. Jack Hamburg ("Hamburg"), a business partner of Shacket, was also in Aurora during the period April 19 through April 22. Hamburg had purchased a used aircraft from Smith Aircraft and was at the Airport to close that transaction. Hamburg did not leave with Shackets but rather left the Airport a few days after Shackets and flew his aircraft to the Dakotas. There was no agreement or understanding that Hamburg would return to Detroit with the title documents that had remained to be completed by Smith at the time Shackets left for home. Though Hamburg testified Shacket had asked him to get some papers from Smith when Hamburg stayed over in Aurora after Shacket's departure, and though Smith promised Hamburg he would mail those papers to Shacket (they were not ready when Hamburg left), this Court (a) credits Hamburg's understanding those papers were "something to do with the financial breakdown" of the purchase transaction and (b) specifically finds those papers were *not* the title documents themselves. To view that testimony (as Philko would) as relating to the Aircraft's title documents would be wholly inconsistent with the uncontradicted testimony—which Philko also credits—that Shacket was rely-

ing on Smith to handle the recording of those documents. This Court does not find the Hamburg events put Shacket on inquiry as to any problem with the procedure of Smith "tak[ing] care of the paperwork," as Shacket had agreed to.

29. Approximately one week after the closing Shacket called Smith to inquire as to the status of his registration. Smith responded he was taking care of the paperwork and Shacket should be getting it in the mail shortly. After the passage of a few more weeks, Shacket called Smith again regarding permanent registration. Smith responded the FAA was backlogged with work (an accurate statement, see Finding 34) but again said Shacket should get the registration shortly. At that time Shacket directed his employee, Charbonneau, to call the FAA to inquire about his permanent registration. On May 15, by a letter from the Aircraft Owner and Pilots Association ("AOPA"), Shacket learned the FAA showed Aircraft N78MS in an unregistered status. Shacket again called Smith, who assured him (again accurately) the FAA had a substantial backlog of five to six weeks in recording instruments.

30. In early June 1978 Shacket again attempted to call Smith to inquire about his permanent registration but found Smith's telephone line had been disconnected. Shacket immediately called Rittenhouse as to Smith's whereabouts. Rittenhouse responded Shacket should call Richard Andrews ("Andrews") of the Sandwich State Bank ("Bank"). Shacket then telephoned Andrews. Andrews told Shacket (a) Bank was claiming a security interest in Aircraft N78MS and (b) McArdle of Pheasant Run was the owner of the Aircraft. Andrews demanded possession of the Aircraft on Bank's behalf. Shacket refused.

31. Shacket then located a phone number for Pheasant Run and telephoned McArdle. McArdle told Shacket "you owe us money on the airplane," said if Shacket had any questions he should call McArdle's attorney and promptly hung up on Shacket.

32. Shacket immediately located his copy of the temporary registration form and instructed Charbonneau to send it to the FAA. In response to Charbonneau's filing of the temporary registration, the FAA wrote that in order to show registration in Shackets' name the FAA would need a bill of sale from Philko to Maurice and Sylvia Shacket.

■ 33. Only one title document relating to the Aircraft was in Shacket's possession after the closing: the signed purchaser's copy of Smith Aircraft's bill of sale to Shackets. That bill of sale would have been a recordable document for FAA purposes (just as the FAA would have accepted for recording the original signed seller's counterpart of the bill of sale, the counterpart that Smith had retained and had represented to Shacket he would transmit to the FAA with the other bills of sale in the chain of title—the "paperwork" that Smith had said he would handle for Shackets and that Shackets had reasonably relied on Smith to handle). If it were coupled with the chain-of-title bills of sale from Piper through mesne transferees to Smith Aircraft,[4] the purchaser's copy of the bill of sale would have been effective to put Shackets in title to the Aircraft for FAA purposes. But it would have been futile for Shacket to tender the signed purchaser's copy of the Smith Aircraft-to-Shackets bill of sale to the FAA. As finding 32 reflects, that agency had taken the position, in response to Shackets' application for registration, that a bill of sale had to be obtained by Shackets from Philko. Accord-

ingly Shacket's not having sent the purchaser's copy to the FAA does not reflect any lack of reasonable diligence on his part at that stage.

34. During May 1978 a search of FAA records would have revealed Aircraft N78MS to be in an unregistered status. During that time period there was a lag of six to eight weeks between the filing of documents with the FAA and their recordation.

35. Maurice and Sylvia Shacket have been in continuous possession of the Aircraft since April 21, 1978.

36. To return to the events immediately following Shackets' purchase of the Aircraft, on April 21, 1978 (after the Shacket transaction had closed and Shackets had taken possession of the Aircraft) Smith visited McArdle at McArdle's office at Pheasant Run. Smith told McArdle he had contracted to sell a 1978 Piper Navajo (in fact, the Aircraft) to Krueger Aviation ("Krueger"), showing McArdle a purported aircraft purchase order with Smith Aircraft as seller and Krueger as purchaser of Aircraft N78MS. Smith said the sale price was to be approximately $290,000, but he needed financing to pay his Piper dealer, Clark Aviation, for the aircraft previously delivered to Smith Aircraft. Smith described the Aircraft, saying it was in Michigan having avionics equipment installed at North States, the Piper distributor. Smith showed McArdle copies of the bills of sale, which McArdle believed were the original bills of sale.[5] Smith told McArdle he had

---

4. Those were the documents reasonably entrusted by Shackets to Smith as part of the "paperwork" for transmittal to the FAA, but then wrongfully delivered by Smith to Andrews acting for Philko. Those same documents were later sent by Andrews (acting for Philko) to the FAA in late May 1978, after Philko was already aware of Smith's wrongful conduct.

5. Philko Proposed Finding 42 would have it Smith had in his possession and showed McArdle all the *original* bills of sale establishing a clear chain of title from Piper through the mesne transferees to Smith Aircraft. If that was in fact the case, under all the circumstances then known to Philko (including Smith Aircraft's troubled financial circumstances) that

would equally—if not to an even greater extent—have put McArdle on inquiry notice that there was something irregular about the transaction as described by Smith. If Smith Aircraft already *had* a good chain of title to the Aircraft, it did not need financing to complete its sale to Krueger. Smith's very need to obtain immediate financing in such a large amount, coupled with the unpaid $60,000 on the loan from Pheasant Run (despite McArdle's pressure for payment), and coupled with what Philko already knew about the deterioration of Smith Aircraft's financial condition since it began FBO operations at the Airport, operated strongly to put McArdle (that is, Philko) on inquiry as to the

exceeded his line of credit with CCEC and Bank had refused to extend a loan. Smith asked McArdle to obtain a loan to enable Smith Aircraft to acquire the Aircraft. McArdle agreed to provide such financing, obtaining a loan from Bank for that purpose.

37. Smith had brought certain loan documents to the meeting with McArdle. After telephoning Andrews at Bank, McArdle partially completed and signed some documentation (dated April 24, 1978) for the proposed transaction (including a note from Philko to Bank, to be secured by the Aircraft) and instructed Smith to complete the documentation with Andrews. McArdle called Andrews and told him Smith would deliver the executed documents to Bank. McArdle never attempted to communicate with Clark Aviation to verify the version of the transaction Smith had given him, or to communicate with Krueger or North States to verify either the purported sale to Krueger or the location of the Aircraft. Any one of those inquiries would quickly have uncovered Smith's fraud and would have led to McArdle's (and hence Philko's) actual knowledge of Shacket's prior ownership of the Aircraft. Nor did McArdle inquire of Smith as to the custom N number assigned to the Aircraft.[6]

38. Smith and McArdle agreed that when Smith Aircraft consummated its sale of the Aircraft to Krueger:

(a) Philko would be repaid the $152,000 it was borrowing from Bank to turn over to Smith Aircraft.

(b) Smith Aircraft would apply the excess of the sale proceeds to repay the outstanding $60,000 balance on the $80,000 note owed to Pheasant Run. That understanding (in total contrast to the position, urged by Philko during the course of this action, that the $60,000 was additional consideration paid by Philko for the Aircraft) follows from the very nature of the Smith-McArdle agreement and is reconfirmed by the fact that in July 1978 *Pheasant Run*, by its and McArdle's attorneys Bishop & Crawford, made a demand on Smith and Smith Aircraft for repayment of the $60,000.

(c) Smith Aircraft was entitled to retain all remaining proceeds of the sale of the Aircraft.

Although Philko received a bill of sale from Smith Aircraft in connection with the transaction, it never intended to take possession of the Aircraft. In fact, its only intention with respect to the Aircraft was to hold the bill of sale as security for (1) the $152,000 loan it was then obtaining from Bank (the only new consideration Philko was providing to Smith Aircraft) and (2) for repayment of the antecedent $60,000 debt owed by Smith Aircraft to Pheasant Run, another McArdle company.

39. Through its receipt of various statements of account and financial reports, Philko was well aware during the relevant period of the financial condition of Smith Aircraft, which was insolvent in both the equity sense (inability to pay its debts as they matured) and the balance sheet sense (liabilities substantially in excess of assets). Philko assuredly had actual knowledge of the first type of insolvency on the part of Smith Aircraft, and there is equally no doubt the facts then known to Philko gave rise to either its actual knowledge or its inquiry notice of the second type of involvency as well.

40. Smith took the loan documents to Bank on or about April 22. At that time Andrews completed the paperwork and filled in the information on the note previously executed by McArdle in Bank's favor. Smith turned over to Andrews all the origi-

---

real status of the Aircraft and as to Smith Aircraft's interest in it.

**6.** Unlike the entire situation described in Findings 10–14, 36 and 39 and n. 5, the assigned N number is not a matter that would itself put McArdle and Philko on inquiry—it was not the kind of fact to whose significance a party inexperienced in aircraft transactions would be expected to be alerted. However, had Philko inquired (as it should have) because of all the other warning signals, the assigned number would have proved to be an added (really an incremental) piece of evidence as to the irregularity of the entire transaction.

nal bills of sale (Piper to North States, North States to Clark Aviation and Clark Aviation to Smith Aircraft).[7] Andrews caused an original bill of sale from Smith Aircraft to Philko to be prepared from blank bills of sale Bank kept on hand. McArdle had already filled in the dates and principal amount on the note from Philko to Bank. After completing the paperwork (including a Trust Receipt and Security Agreement executed by Philko in Bank's favor), Andrews issued to Smith Aircraft a cashier's check payable to Clark Aviation in the amount of $152,000, showing Smith Aircraft rather than Philko as the remitter.

41. Smith took the cashier's check and flew to Clark Aviation in Bloomington, Illinois on the afternoon of April 22. At that time Smith tendered to Rittenhouse the $152,000 check as the final payment for the Aircraft (actually an overpayment of some $4,921 on the balance of the agreed-upon purchase price).

42. From the outset of this litigation through the Trial (a period of some eight years!) Philko has asserted it *purchased* the Aircraft as the result of the transaction described in the preceding Findings.[8] Even at trial both McArdle and Bank's Andrews characterized what Philko did in those terms (Andrews testified McArdle told him

7. There is confusion in the record as to whether Smith previously had the original documents in his possession or whether he obtained them from Rittenhouse after meeting with McArdle. Once again, for the same reasons as stated in n. 5 the resolution of that question is really irrelevant to the issues as between Shackets and Philko.

8. Indeed Paragraph 2 of Philko's Amended Counterclaim—its final pleading—alleged in part:

On or about April 22, 1978 Smith Aircraft agreed to sell the aircraft to Philko in exchange for the payment of One Hundred Fifty-two Thousand ($152,000) Dollars.

Philko's prior position had been that it paid $212,000 (by adding the unpaid $60,000 on the preexisting Smith Aircraft note to Pheasant Run), but its counsel obviously finally realized that assertion was wholly inconsistent with the continued attempts by Pheasant Run (through the same law firm!) to demand payment of that $60,000 from Smith and Smith Aircraft months after the "sale" to Philko.

on the day the deal was made, April 21, 1978, he was "interested in purchasing it"). Philko's attempted proof of damages during the Trial was based on that theory as well.[9] Only post-trial, in its proposed Findings and Conclusions, when it obviously realized its "purchaser" position was fatal to it on the "actual notice" issue, has Philko shifted its position to a claim that it has a *security interest* (on the theory its $152,000 payment with Bank funds was a loan from Philko to Smith Aircraft, and it is also entitled to recover for Pheasant Run's loan to Smith Aircraft).

■ 43. Philko's position that it purchased the Aircraft is untenable both in fact and in law (see this Court's original opinion, 497 F.Supp. 1262, 1269–71 (N.D.Ill. 1980), *aff'd*, 681 F.2d 506, 512 (7th Cir. 1982)[10]). If Philko *were* a "purchaser," it could not be a bona fide purchaser: Its payment of $152,000 was grossly and patently inadequate and disproportionate to the fair value of the brand-new Aircraft, which on the uncontradicted evidence was worth a full $250,000 even at wholesale (Piper, the manufacturer, was charging its distributor well over $200,000). Indeed Philko's own Amended Counterclaim ¶ 9 alleges:

9. Both in its Amended Counterclaim ¶ 10 and at the Trial, Philko's alleged damages were asserted in terms of (1) depreciation in value of the Aircraft while in Shackets' possession plus (2) net rental value for the number of hours Shackets have flown the Aircraft—a total of some $370,000. Astonishingly enough, Philko saw no inconsistency between the notion that an aircraft could be purchased for $152,000 in 1978 and the assertion that it could have depreciated in value in the ensuing eight years by slightly *more* than that figure (some $153,356) to a "current fair market value ... which is $110,344" (Philko Proposed Conclusion of Law ¶ 37), and no inconsistency between the same notion and the assertion that the Aircraft's net rental value for 940 hours of usage during the same period was an added $214,312 (*id.*).

10. Nothing in the Supreme Court's opinion casts any doubt on that holding. Instead the Supreme Court simply assumed, without deciding, Philko was an "innocent third part[y]" (462 U.S. at 414, 103 S.Ct. at 2481)—a question open on this remand.

On June 16, 1978, the aircraft had a fair market value of about $263,700.00.

Nor is this a matter of hindsight—a matter of which Philko (McArdle) did not know or should not have known. McArdle was apprised by Smith of the purported sale to Krueger for nearly twice the $152,000, and all the circumstances of the transaction preclude Philko from claiming it was (in the Supreme Court's adjective, 462 U.S. at 409, 410, 412, 414, 103 S.Ct. at 2478, 2478, 2479, 2481) an "innocent" purchaser.

44. Even if Philko were entitled to assert such a total shift in its claimed position post-Trial, from that of a purported "purchaser" at a grossly inadequate price to that of a secured lender,[11] it cannot claim as an "innocent" lender. All the circumstances of the transaction, coupled with Philko's preexisting knowledge of the insolvency of Smith Aircraft, preclude Philko from asserting that status. It was certainly put on inquiry at the very least, and even the most minimal inquiry would have disclosed the fraud being perpetrated by Smith and Smith Aircraft.

45. Despite the extent of Philko's knowledge and obligation to inquire as referred to in the preceding Findings, at no time in connection with the transaction between Smith Aircraft and Philko regarding the Aircraft did McArdle, or anyone else associated with Philko, call or attempt to call either Krueger, North States or Clark Aviation. Nor did either McArdle or anyone associated with Philko inspect or ask to inspect the Aircraft before entering into the transaction with Smith Aircraft. As Finding 37 reflects, any such inquiry would

quickly have led to actual knowledge of Shacket's prior ownership of the Aircraft.

46. According to Smith's testimony:

(a) Sometime during the middle or latter half of May 1978, he called and then met with McArdle about Smith's (and Smith Aircraft's) financial problems.

(b) Smith then told McArdle he had improperly refinanced aircraft belonging to Philko but still needed additional financing from Philko to conduct the Smith Aircraft business.

(c) Without resolving the situation, McArdle agreed to meet with Smith again the following day.

(d) Next day Smith met in McArdle's office with McArdle and his lawyer, Leslie Bishop. Smith again spoke of his having liened aircraft owned by Philko and, in response to McArdle's questions ("Is this everything? Is it all out on the table?"), also told McArdle and Bishop that aircraft N78MS was a $290,000 plane with a $152,000 note that had to be paid off because the Aircraft had already been sold to a fellow in Detroit.

(e) In response to Bishop's question about where the titles and records were, Smith said they were being held at Bank as security. Bishop then said the documents should be filed with the FAA.

McArdle denied any such meeting before June 1,[12] but he did testify he had received a telephone call from CCEC May 24 or 25 "saying Smith Aircraft was in arrears on loans guaranteed by McArdle and that [CCEC] planned to call upon McArdle to pay out under his guaranty agreement" (Philko proposed Finding 60). This Court finds it highly likely that such a notifica-

---

11. Considerable doubt exists as to the propriety of such a switch, when Philko has conducted itself throughout the litigation on the "purchaser" theory, thereby leading Shackets and their counsel to defend their own position on that basis. See the discussion of this subject in the Conclusions. There is another important corollary to Philko's attempted shift in position: It would directly give the lie to McArdle's testimony at the Trial that he had agreed to *purchase* the Aircraft. That testimony's inherent incredibility reinforces the discrediting of McArdle's testimony, as described in later Findings.

12. Bishop denied having been in such a meeting at all, but his time records show he spent extensive time on McArdle matters on each of the days, and the time records of his partner John Dore show 6.8 hours spent on "Philko Aviation v. Roger Smith Aircraft" May 26. Dore testified he then knew of McArdle's having been notified of having to make payments on CCEC indebtedness. For the reasons stated in this Finding 46, this Court cannot credit Bishop's recollection (though it does not find Bishop deliberately misstated the situation).

tion would have triggered an immediate inquiry from McArdle to Smith,[13] and that renders Smith's version more plausible than McArdle's. It also provides a more credible explanation of the filing referred to in Finding 47 than the sheer coincidence that would otherwise be required to reconcile the timing of that filing with Andrews' testimony (see n. 14).

47. On May 26 Andrews, as agent for Philko, mailed for filing with the FAA the original bills of sale from Piper to North States, North States to Clark Aviation, Clark Aviation to Smith Aircraft and Smith Aircraft to Philko. Those documents were received by the FAA May 31 and recorded June 13, 1978. That filing was triggered by Philko's knowledge of problems with Smith and Smith Aircraft.[14]

48. On June 1 McArdle received formal notification from CCEC that Smith Aircraft was in default under its lines of credit. On or about June 2 McArdle, Bishop and Dore went to the Airport to meet with Smith. McArdle, through his attorneys, demanded that Smith and Smith Aircraft vacate the premises. Smith did so June 7, and Philko assumed the operations previously handled by Smith Aircraft. On June 7 most of the employees of Smith Aircraft were rehired by Philko. On June 9 Smith Aircraft obtained a preliminary injunction order prohibiting Philko from denying Smith and Smith Aircraft possession of the Airport premises. That order was then superseded by a June 12 agreed order in which Smith and Smith Aircraft were given a 10-day period to wind up operations and vacate the Airport premises. They did so.

13. According to McArdle he made no effort to talk to Smith until after he received a formal letter from CCEC (Philko Ex. 24) on June 1 or 2, specifying an entire group of defaulted loans aggregating nearly $43,000 (see Finding 48). That simply does not ring true. Both from this Court's observation of McArdle and from the natural reaction to be expected to the initial CCEC telephone call, McArdle would certainly have gotten in touch with Smith immediately as to what was going on.

14. Andrews testified Bank's standard procedure in 1978 was to defer the filing of aircraft title documents for not more than 30 days where the

49. No findings are made with respect to Philko's claimed damages under its Counterclaim for two reasons:

(a) As the Conclusions will reflect, Philko is not entitled to prevail on its Counterclaim in any event.

(b) Even if Philko were to prevail in this litigation, it could not do so as the purchaser of the Aircraft: It was never intended to become, and never was, a purchaser (let alone a bona fide purchaser) even on its own version of the facts. All of Philko's proof of damages (claimed diminution in fair market value of the Aircraft from June 1978 to the time of the Trial [Philko proposed Finding 80] and claimed reasonable rental value of Shackets' usage of the Aircraft [Philko proposed Finding 81]) would have been relevant *only* on the basis of a determination Philko had purchased the Aircraft in 1978.

It should however also be made clear Philko's attempted proof, even on its own terms, was not credible as to either asserted component.[15] Finally on the issue of Philko's claimed damages, its proposed Conclusion 34 is based on a theory never advanced by Philko from the beginning of this action to and including the Trial—and it too fails as a matter of proof, as well as a matter of law.

### Conclusions of Law

Though the preface to the Findings identified the issues now under consideration a bit differently, the mandate from our Court of Appeals characterized this Court's function in these terms (drawing on the state-

party involved was a dealer and a sale of the aircraft was likely. That may well have been true in general terms, but the "coincidence" of timing that ties the May 26 filing of the Aircraft's chain-of-title documents (something more than 30 days after the April 22 closing) to the time (May 25 or 26) McArdle acknowledges having learned of Smith's defaults to CCEC makes the text conclusion, as stated in Findings 46 and 47, the more likely explanation.

15. Given the nature of this Court's analysis, it has elected not to spell out the fallacies in Philko's proof of damages—a moot issue.

ment of issues by the Supreme Court, 462 U.S. at 414, 103 S.Ct. at 2481):

> That the case be REMANDED to the district court for proceedings consistent with the Supreme Court's opinion, for development of any required record, and for determination of at least:
>
>> (1) Whether the district court had so considered and dismissed count II (involving notice) as to justify a holding of waiver or res judicata because there was no cross appeal.
>>
>> (2) Whether Philko's conveyance instruments were valid under Illinois law.
>>
>> (3) Whether the Shackets exercised diligence to record their conveyance.

These Conclusions will address each of the relevant issues.

### Jurisdiction

Shackets (the sole plaintiffs from the beginning) have been and are citizens of the State of Michigan. Philko is a Delaware corporation with its principal place of business in Sandwich, Illinois. Though only Shackets and Philko remain the active litigants, none of the other parties joined as defendants or third-party defendants was a Michigan citizen. There is no question this Court had and has jurisdiction under diversity of citizenship under 28 U.S.C. § 1332.

### Effect of Count II Dismissal

Post-remand this Court issued an opinion (590 F.Supp. 664 (N.D.Ill.1984)) deciding that Shackets' failure to appeal the original summary judgment in favor of Philko and McArdle on Complaint Count II had rendered that a final judgment, "with full res judicata and collateral estoppel effects" (*id.* at 667). But that meant Shackets were "foreclose[d from] relitigation of Philko's claimed actual *knowledge* [of Shackets' interest in the Aircraft], but not of its claimed 'actual notice' based on less than outright knowledge" (*id.* at 668, emphasis in original).

These Conclusions will therefore deal with the open "actual notice" question. In that respect it should be emphasized the picture developed from the full Trial is dramatically different from the capsule version on the basis of which this Court had taken its "brief separate look" (*id.* at 669–70)—for example, though this is not exhaustive:

1. Philko's and McArdle's knowledge of Smith Aircraft's financial situation proved to be much more extensive, and much more damaging to them on the "actual notice" issue, than this Court had before it at the earlier post-remand stage.

2. Smith did not in fact represent himself as Clark Aviation's broker or agent in the Aircraft transaction (the alleged "fact" tendered to this Court at the time of Philko's motion, *id.* at 665, 670). Because Smith Aircraft purported to be acting for itself and not for Clark Aviation, its possession of the original bills of sale—despite the large sum McArdle claims Smith sought as purportedly necessary to resell the Aircraft to Krueger Aviation—was a highly suspicious circumstance, as discussed in the Findings.

But before the entire question of "actual notice" is addressed, this Court will examine the question our Court of Appeals described in its remand order as "[w]hether Philko's conveyance instruments were valid under Illinois law."

### State Law and the Validity of Philko's Interest

Philko filed its bill of sale with the FAA before Shackets—that is undisputed. But that is not conclusive as to the validity of Philko's interest in the Aircraft, for among other reasons (462 U.S. at 414, 103 S.Ct. at 2481) (footnote omitted):

> [I]f, under state law, Philko failed to acquire or perfect the interest that it purports to assert for reasons wholly unrelated to the sale to the Shackets, Philko would not have an enforceable interest and the Shackets would retain possession of the aircraft.

Shackets urge the December 1, 1977 corporate dissolution of Smith Aircraft by the State of Illinois renders void its post-dissolution conveyance of the Aircraft to Philko

(see former Ill.Rev.Stat. ch. 32, ¶¶ 157.79 et seq., now *id.* ¶ 12.30). That however ignores the concept of de facto corporate activity recognized both by Illinois statute (see former *id.* ¶ 157.150, now *id.* ¶ 3.20) and case law (see, e.g., *Richmond Wholesale Meat Co. v. Hughes,* 625 F.Supp. 584, 587–89 (N.D.Ill.1985); *Steve's Equipment Service, Inc. v. Riebrandt,* 121 Ill.App.3d 66, 70, 76 Ill.Dec. 612, 614–615, 459 N.E.2d 21, 23–24 (2d Dist.1984)).

■ Accordingly, when title to the Aircraft was taken in the name of Smith Aircraft despite its then-existing lack of corporate capacity, as a matter of law Smith acquired that title as a sole proprietor. In turn the Smith Aircraft bill of sale to Shackets was effective to transfer title from Smith (as sole proprietor) to Shackets. And by the same token, if the later Smith Aircraft bill of sale to Philko were otherwise valid and binding, it too would have been effective (in state law terms) as a conveyance from Smith (as sole proprietor) to Philko.

There is still another concept that would ordinarily be a function of state law: whether Philko was a bona fide purchaser of the Aircraft without notice of adverse claims (as it has maintained from the outset of this litigation through the Trial), or perhaps whether it was a bona fide secured lender, again without notice (as it has now attempted to shift its stance). On that score our Court of Appeals—in a holding seemingly left untouched by the Supreme Court—affirmed this Court's conclusion (497 F.Supp. at 1269–71) by saying (681 F.2d at 512):

Philko's claim under state law is twice flawed: it cannot be a buyer in ordinary course; and its failure to take possession precludes acquisition of good title as a good faith purchaser for value.

After its confirmation of this Court's analysis of the Philko-Smith Aircraft transaction and a review of the applicable provisions of the Uniform Commercial Code, the Court of Appeals concluded (*id.*):

Accordingly, under state law, Philko acquired no title to the aircraft.

■ That certainly *sounds* like a decision adverse to Philko on the question "[w]hether Philko's conveyance instruments were valid under Illinois law"—or, in the language of the Supreme Court (462 U.S. at 414, 103 S.Ct. at 2481), whether "under state law, Philko failed to acquire or perfect the interest that it purports to assert for reasons wholly unrelated to the sale to the Shackets...." If so, this Court certainly agrees fully and adheres to that position (indeed, there is a good deal to be said for viewing it as law of the case, though that question and the effect of the Supreme Court's silence on the issue are matters not addressed by the parties). But in case the Supreme Court somehow intended the question to be viewed as a function of notice to Philko at the time it acquired its purported interest, in which event the question of "notice" in state-law terms would be mirrored in Section 503's "actual notice" exception, these Conclusions will turn to the latter issue.

### *"Actual Notice"*

■ Cases construing Section 503 have consistently held "actual notice" includes not only actual knowledge of the unrecorded interest, but also circumstances that should have provoked further investigation or inquiry. See, e.g., this Court's post-remand opinion, 590 F.Supp. at 667 & n. 6 and authorities cited; *Lockhead v. G.A.C. Finance Corp.,* 6 Ariz.App. 539, 434 P.2d 655, 658 (1967). Inquiry notice exists where a person has knowledge of such facts as would lead a fair and prudent person using ordinary care to make further inquiries. Where the person does not take those added steps, he or she is chargeable with knowledge that would have been acquired through diligent inquiry. *Application of County Collector (Burdash v. Olsen),* 48 Ill.App.3d 572, 588, 6 Ill.Dec. 415, 426–27, 362 N.E.2d 1335, 1346–47 (1st Dist. 1977).

"Actual knowledge" needs no elaboration—for as this Court's post-remand opinion has held, that question is no longer open to Shackets. But as for the "inquiry

notice" branch of "actual notice," in this case that depends upon whether or not Philko and its president, McArdle, by virtue of their relationship with Smith and Smith Aircraft, had such knowledge as placed them under an obligation to conduct a reasonable investigation, which in turn would have revealed Shackets' interest in the Aircraft.

Either of two dates might perhaps be the relevant date for determining the presence or absence of such "actual notice" on Philko's part:

1. the date on which Philko paid $152,000 for an interest in the Aircraft, in exchange for delivery to Bank (acting on Philko's behalf) of the chain-of-title bills of sale; or

2. the later date on which Bank (still acting on Philko's behalf) sent the bills of sale to the FAA for recording.

If the latter date applied, Philko unquestionably then had actual *knowledge* (and hence actual notice) of Shackets' interest in the Aircraft—see Findings 46–47. But Shackets offer nothing on that score other than to say (proposed Conclusions at 20):

The fact is, under the Supreme Court's opinion in this case, there is a serious question as to when actual notice of an interest is to apply. Is it to be applied at the time of the actual transaction, or is it to be applied at the time that the party actually attempts to record its interest in the aircraft?

■ Shackets tender no authority to answer that question. Philko correctly draws on the general proposition that a buyer or mortgagee is entitled to priority based on whether he, she or it acquires an interest and gives value for it before receiving notice of prior unrecorded interests. *Life Savings & Loan Association of America v. Bryant,* 125 Ill.App.3d 1012, 1019, 81 Ill.Dec. 577, 582, 467 N.E.2d 277, 282 (1st Dist.1984). This Court concludes that principle applies here. Hence Philko's acquisition of actual knowledge of Shackets' interest before Bank sent the papers to the FAA, though such knowledge has been established despite McArdle's contrary testimony and Bishop's inaccurate recollection, becomes irrelevant. Instead the focus must be on the extent of Philko's knowledge when it caused Bank to pay Smith Aircraft $152,000 in April 1978.

In that respect both Shackets and Philko have sought to overreach in factual terms—Shackets by again arguing Smith Aircraft and Philko were partners, so as to impute the former's knowledge to the latter, and Philko by arguing it *bought* the Aircraft for $212,000, then shifting ground to argue it *bought* the Aircraft for $152,-000 (after the evidence had unquestionably established Philko's lawyers, acting for Pheasant Run and McArdle, had continued to press for repayment of the $60,000 loan), and finally—post-Trial—shifting ground once again to urge Philko had not bought the Aircraft at all, but had merely acquired a security interest. Though neither litigant's position in those respects is therefore tenable, each bears significantly on the decision here.

■ First, the absence of an actual partnership relationship between Philko and Smith Aircraft is not the critical fact for current purposes. Instead the facts referred to in the Findings of which Philko had actual knowledge, both (1) as to Smith Aircraft and its precarious financial position and (2) as to the suspicious nature of Smith Aircraft's claimed transaction regarding the Aircraft itself, really cried out for further investigation by Philko—rather than Philko's having the right to play ostrich as it now contends.

Even the most minimal investigation by Philko, reasonably required in light of what Philko *actually* knew, would have unraveled the skein of Smith's misrepresentations and led to Philko's actual knowledge of the fraudulent scheme:

1. Whether or not Smith really had possession of the original bills of sale when he met with McArdle, McArdle certainly believed that to be so. And of course such possession was inconsistent with Smith's statement that the $152,000 he sought was needed to pay the rest of

the purchase price of the Aircraft to enable Smith Aircraft to resell it to Krueger (it will be remembered that contrary to the presentation Philko made to this Court when it ruled on the post-remand Philko motion for summary judgment, Smith did *not* represent Smith Aircraft to be Clark Aviation's broker or agent—Smith instead put the deal to McArdle and Andrews as that of Smith Aircraft itself). That suspicious circumstance certainly should have put Philko and McArdle on notice that something was wrong—at a minimum causing them to inquire of Clark Aviation as to how and why Smith had the original bills of sale.

2. On McArdle's own testimony saying Philko purchased the Aircraft for $152,000 (which McArdle shifted, in a blatant display of opportunism, from a claimed purchase for $212,000 only after it had developed McArdle's lawyers had continued post-"purchase" to seek payment of the $60,000 due on the note to Pheasant Run), that fact alone would have put Philko on notice to investigate further. McArdle claimed Smith Aircraft was selling to Philko, for $152,000, an aircraft Philko itself says had a fair market value of at least $263,000 at that time in 1978—an aircraft purportedly being resold to Krueger for $292,000. That type of highly suspicious circumstance is dealt with in cases dealing with the analogous question of the receipt of stolen property, where courts look to facts from which knowledge of the "hot" nature of the goods can be inferred. Understandably the most probative of such facts is the payment of much less than the fair market price for the goods (see, e.g., *United States v. McCullah*, 745 F.2d 350, 354 (6th Cir.1984); *People v. West*, 60 Ill.App.3d 570, 572, 17 Ill.Dec. 934, 936, 377 N.E.2d 124, 126 (1st Dist. 1978)).

3. Although Philko's intimate knowledge of Smith Aircraft's precarious financial condition might not alone have put Philko on inquiry notice, when coupled with the other suspicious circumstances of the time-pressured transaction

for the Aircraft it certainly had that effect. These Conclusions have already dealt with the problematic fact of Smith's possession of the bills of sale. Suppose however that could have had a legitimate explanation—even so, at a minimum Smith Aircraft would have had to pay a very substantial amount down on the Aircraft before Smith came to McArdle (the difference between Smith Aircraft's wholesale purchase price and the $152,000 Smith told McArdle still remained unpaid). Under the hand-to-mouth existence Philko knew Smith Aircraft to be living (both from Philko's handling of the funds derived from Smith Aircraft's operations at the Airport, and from the inability of Smith Aircraft to respond fully to McArdle's demands for repayment of the original Pheasant Run $80,000 loan), the fact of Smith Aircraft's having somehow obtained a substantial sum to pay toward the Aircraft was itself a circumstance calling for further inquiry.

Those matters, individually and collectively, clearly operated to place Philko on inquiry notice. Though the ease of inquiry on Philko's part, and the number of avenues of available inquiry, are not themselves additional matters putting Philko on notice, those factors do bear importantly on the reasonableness of Philko's conduct in hiding its head in the sand despite the red flags already identified in these Conclusions:

1. Most directly, a simple call to Clark Aviation (Rittenhouse) would have disclosed Smith's entire fraudulent scheme. That was both the most obvious and most direct inquiry, and it would have obviated this entire expensive and seemingly endless litigation.

2. During their April 21, 1978 conversation, Smith told McArdle he had a sale of the Aircraft to Krueger for the sum of $292,000. No attempt was made by McArdle or Philko (as they should have made under the circumstances) to communicate with Krueger to verify that story. Had they done so, they would

immediately have learned Smith's statement was not true.

3. Smith also said the reason the Aircraft was not in his possession was because it was having avionics installed at the factory in Grand Rapids. McArdle or Philko never inquired further (as they should have under the circumstances) to learn the identity of the factory: Smith would have responded "North States Aviation." Had McArdle or Philko so inquired and then followed up with North States, he or it would have found North States was only a Piper distributor and had *never* installed avionics.

### Reasonable Diligence

■ This Court has concluded:

1. To quote our Court of Appeals, 681 F.2d at 512, "under state law, Philko acquired no title to the aircraft."

2. Even were that not of itself dispositive, Philko had statutory "actual notice" of the Shackets' interest in the Aircraft not only before Philko *recorded* its own interest with the FAA but, more importantly, before Philko even *acquired* its interest.

Under those circumstances Philko's interest—acquired with notice—should never be able to take priority over Shackets' unrecorded interest. Hence Shackets' reasonable diligence (or lack of it) in attempting to record their interest in the Aircraft with the FAA should be irrelevant. Nonetheless, because the issue of Shackets' diligence was one of those identified as open on remand, both by the Supreme Court and by the Court of Appeals, these Conclusions will deal briefly with the subject.

Nothing in the Supreme Court's opinion suggests a special legal standard for appraising Shackets' diligence in this context. This Court turns to the long-established meaning of that concept, as exemplified in *Nixon v. Weyhrich*, 20 Ill. 600, 606 (1858):

Due diligence means reasonable diligence; it means such diligence as a prudent man would exercise in the conduct of his own affairs.

In like manner (and of like vintage), due diligence has been said to be such diligence as a careful, prudent man of reasonable sense and judgment might reasonably be expected to take. *Jones v. McGuirk*, 51 Ill. 382, 387 (1869).

■ In the context of this case, Shackets satisfy that standard. When they took possession of the Aircraft, they believed they were leaving the bills of sale with the dealer, Smith Aircraft, to have them recorded with the FAA. That was entirely reasonable, and the reliance they placed in the dealer for that purpose was reasonable reliance (Rittenhouse's uncontroverted and wholly impartial testimony as to that same common practice being followed when Clark Aviation sold to its own retail customers, rather than to dealers, is confirmatory and persuasive on that score). Reasonable diligence required no more from the Shackets.

However, Smith did not record the bills of sale with the FAA on behalf of the Shackets, but rather obtained $152,000 from Philko in a fraudulent transaction (which this Court has held Philko entered into with statutory "actual notice" of Shackets' prior interest in the Aircraft) and turned over the bills of sale to Bank, together with a bill of sale from Smith Aircraft to Philko for the Shackets' Aircraft. Neither Philko nor Bank made any effort to record Philko's purported interest in the Aircraft until on or about May 26, 1978.

In the meantime, Shackets had made a number of telephone calls to Smith to determine the progress of recording the bills of sale. They were assured by Smith the FAA was backlogged in recording their interest and it would take some period of time. Those statements as to the then-existing FAA delays were truthful (Andrews of Bank, who engaged in numerous aircraft financing transactions, testified the recording of an interest in an aircraft with the FAA during 1978 often took five to six weeks before it became a matter of record). Shacket did not merely take Smith's statements at face value as time passed without the return of title papers from the FAA.

Shacket had his friend, Charbonneau, have AOPA do a title search on the Aircraft on May 15, 1978. AOPA confirmed there was no recorded interest in Shackets' Aircraft at the time of that title search. Thus Shackets were still exercising reasonable diligence in the factual and legal sense.

Shackets continued to make inquiries of Smith and were again advised not to worry—it took time to have the interest recorded with the FAA. Indeed, Shacket made calls to Rittenhouse of Clark Aviation as to recording. It was of no moment that some period of time had elapsed from the date Shackets took possession of the Aircraft, because the temporary registration (the "pink slip") inserted by Rittenhouse into Shackets' Aircraft was valid for a period of 90 days.

In June 1978, after they could not reach Smith because his telephone was out of service, Shackets attempted on their own to record their interest in the Aircraft. They did not have any of the chain-of-title bills of sale, but rather forwarded their registration (which they understood gave them their interest in the Aircraft) to the FAA for recording. By that time it was too late from the FAA's point of view because, unknown to Shackets, Philko's claimed interest was a matter of record with the FAA. Shackets thereafter learned someone else claimed title to the Aircraft, and this litigation ensued.

In sum, this Court concludes Shackets exercised reasonable diligence in connection with the attempted recording of their ownership of the Aircraft. That was true when they closed their purchase transaction, and it continued to be true through (and after) the time Philko (or Bank on Philko's behalf) acted to cause its own purported interest in the Aircraft to be recorded.

This Court recognizes a very recent Illinois case has taken a very different view of the reasonable-diligence concept in a case also involving fraudulent double dealing in aircraft, *South Shore Bank v. Johnson Hydraulic Mfg. Co.*, 131 Ill.App.3d 1024, 87 Ill.Dec. 400, 477 N.E.2d 1 (3d Dist.1985).

There the first purchaser slept on its rights for 14 months after having relied on its seller (which, like Smith Aircraft, was a Piper dealer), without making its own effort to record its own title papers. In the course of the *South Shore Bank* opinion, the court expressed a double doubt:

1. It did not find the buyer's reliance on the dealer for recording brought the buyer within a "due diligence exception" even if that was a customary practice.

2. It found the 14–month lapse negated any due-diligence argument.

 As already indicated, this Court differs as to the former factor (though it certainly agrees an unduly protracted period of such reliance, even one far less than the 14 months in *South Shore Bank*, would *not* constitute reasonable diligence). But it is unnecessary to resolve the former issue, because as said earlier the question of reasonable diligence is not a necessary link in the chain that defeats Philko's position:

1. Philko's own title was flawed for the reasons stated by our Court of Appeals.

2. Even on the contrary assumption, Philko took its position with actual notice of the Shackets' interest within a day or two after Shackets had bought the Aircraft. Shackets' later diligence (or lack of it) in recording with the FAA would therefore make no difference in the result—the true test of total irrelevance.

### Philko's Shift of Position

This Court's resolution of the merits has really mooted the issue of the propriety of the McArdle-Philko shift of position as to just what their transaction with Smith Aircraft was. Nonetheless, the prospect this case may again find its way to higher courts appears to justify a brief look at that question.

Even in purely intuitive terms there is something unseemly—if not downright outrageous—in a litigant's playing fast and loose with the system as Philko has sought to do here. But neither party has addressed the question in purely legal terms,

and this Court has been disinclined to engage in a major search for relevant authority on its own. Accordingly this opinion will not pause long on the subject.

As already noted, Philko asserted its claimed interest as "purchaser" of the Aircraft from the beginning, and this Court rejected that position, 497 F.Supp. at 1269–71. Philko made the same argument on appeal, and the Court of Appeals rejected it too, 681 F.2d at 512. It is clear from the Supreme Court's opinion, 462 U.S. at 408, 103 S.Ct. at 2477 ("Smith purported to sell the same airplane to petitioner, Philko Aircraft"), that Philko had continued to claim ownership rather than creditor status there as well.

Nothing if not consistent, Philko persisted in saying it had bought the Aircraft (just before trial, its Amended Counterclaim alleged just that). And at the Trial McArdle, a sophisticated entrepreneur with major business holdings and experience, stuck to that story in the face of probing cross-examination about the economic effect of the transaction. Philko's evidence on damages was predicated entirely on the premise of its ownership. During closing argument its lawyer insisted on Philko's ownership despite this Court's avowed skepticism on that score. Only in the cold light of post-Trial preparation of proposed Findings and Conclusions has Philko's counsel shifted ground to the security-interest claim that Shackets' counsel did not defend against (because not called on to do so) at the Trial.

■ All that might perhaps lead to rejection of Philko's new-found (and totally belated) argument as failing to satisfy Rule 15(b), which calls for "express or implied consent of the parties" to a trial of "issues not raised by the pleadings." See *In re Prescott*, 805 F.2d 719, 725 (7th Cir.1986). Certainly that was not true as to Shackets here; see, e.g., *Campana v. Eller*, 755 F.2d 212, 215 (1st Cir.1985). And it would certainly be unfair—would prejudice Shackets—to allow Philko so to change its case after it has conducted eight years of litigation at all three levels of the federal system. See, e.g., *McKee-Berger-Mansueto, Inc. v. Board of Education of the City of Chicago*, 626 F.2d 559, 563 (7th Cir.1980).

But even if Philko could surmount the Rule 15(b) hurdle, surely equitable notions (akin to estoppel) foreclose what it essays here. This situation is much like the one that has led Illinois courts to adopt the doctrine that bars a litigant from "mending its hold": changing its litigation stance after its opponent has mustered and expended its own forces to counter the original theory. Indeed this case is startlingly similar to *Rural Electric Convenience Co-operative Co. v. Illinois Commerce Commission*, 118 Ill.App.3d 647, 653–54, 73 Ill.Dec. 951, 955, 454 N.E.2d 1200, 1204 (4th Dist. 1983), where the litigant was not permitted to "mend its hold" by "chang[ing] its theory [of recovery] ... after all the evidence in the case had been heard."

One related issue also bears passing mention: Philko's attempted proof of damages on the purchase theory it now seeks to abandon, and its corresponding failure of proof on the security-interest theory it now seeks to embrace. This might or might not be the appropriate case to apply the strict Illinois rule that a party that "establishes that [it] is entitled to damages, yet fails to establish a proper basis from which those damages can be computed, [ ] is entitled to only nominal damages." *Brewer v. Custom Builders Corp.*, 42 Ill. App.3d 668, 678, 1 Ill.Dec. 377, 385, 356 N.E.2d 565, 573 (5th Dist.1976) (citations omitted), relied on by this Court in *Norfolk & Western Railway Co. v. United States Railway Equipment Co.*, 563 F.Supp. 747, 749–50 (N.D.Ill.1983), *aff'd mem.* 753 F.2d 1078 (7th Cir.1985). But what is unquestionably true is that Philko has *not* provided the predicate for what it now seeks to urge as its damages under its new-found reshaping of its own transaction.

\* . \* \*

Shackets have proved their right to the declaratory judgment they seek: They are entitled to ownership of the Aircraft—the series of conveyances originating with Piper and carrying title into Smith Aircraft are

valid, as is the transfer from Smith Aircraft to Shackets, while the bill of sale from Smith Aircraft to Philko is not valid and enforceable against Shackets for the several reasons previously stated. This opinion and order should alone suffice to cause the FAA to record good title in Shackets, but if that is not the case Philko is ordered to execute a bill of sale to Shackets forthwith upon their demand. Philko's Amended Counterclaim is dismissed with prejudice.

## MEMORANDUM OPINION AND ORDER

■ This Court's November 20, 1986 findings of fact ("Findings") and conclusions of law ("Conclusions") resulted in a judgment in favor of Maurice and Sylvia Shacket ("Shackets") and against Philko Aviation, Inc. ("Philko") on both Shackets' claim against Philko and Philko's counterclaim against Shackets. Because Shackets' Third Party Complaint against Clark Aviation, Inc. ("Clark") and Kenneth Rittenhouse ("Rittenhouse") was not at issue in the trial between Shackets and Philko that led to the Findings and Conclusions, the judgment in Shackets' favor was on "fewer than all of the claims" and involved "fewer than all of the ... parties" in this action. It was therefore not a "final judgment" as to all the claims and all the parties.[1]

Both during and after the trial, neither the litigants nor this Court had focused on the remaining claim of Shackets against Clark and Rittenhouse (understandably so, because that claim is a contingent one: Shackets say if they are liable to Philko, the fault was that of Clark and Rittenhouse). Were that remaining claim limited to pure indemnity (essentially "if and to the extent Shackets must pay Philko, Clark or Rittenhouse or both must make Shackets

whole"), it would be easy to devise an orderly termination of the entire litigation now. That could be accomplished by simply dismissing the indemnity claim, without prejudice to its reassertion were the Shacket-Philko result overturned on appeal. No Rule 54(b) considerations would be involved.

But Shackets seek more from Clark and Rittenhouse. Shackets assert their embroilment in this extensive (eight-plus years) and expensive (once all the way to the Supreme Court, and now on a second trip to the Court of Appeals) litigation is directly chargeable to Clark and Rittenhouse. Because Shackets' attorneys' fees are therefore part of their claim, it would represent a true rather than a logically-flawed instance of Zeno's Paradox to prevent appealability of the Shackets-Philko dispute until the Shackets-Clark-Rittenhouse litigation had reached finality: Were such nonappealability to be the rule, the arrow could *never* reach the target.[2]

Accordingly this Court is called upon to make a Rule 54(b) determination. Both Shackets and Philko favor it—Philko to get on with its appeal (it has previously filed an ineffective notice of appeal) and Shackets to conclude their controversy with Philko and, if successful, to quantify their claim against Clark and Rittenhouse.

There is no question of the potential applicability of Rule 54(b), for the Shackets-Philko determination is "a decision upon a cognizable claim for relief" (*Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7, 100 S.Ct. 1460, 1464, 64 L.Ed.2d 1 (1980)) and "an ultimate disposition of an individual claim entered in the course of a multiple claims action" (*id.*, quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436, 76 S.Ct. 895, 900, 100 L.Ed. 1297

---

1. All the quoted terms in this and the prior text sentence are drawn from Fed.R.Civ.P. ("Rule") 54(b), which controls the finality—and hence both the enforceability and appealability—of partial dispositions of actions.

2. It takes only a bit of thought to see (1) the Shackets-Clark-Rittenhouse litigation could never be concluded until the total fees in the Shack-

ets-Philko were known, (2) those total fees could never be known until the appeal had been concluded and (3) the appeal could never be concluded until the Shackets-Clark-Rittenhouse dispute had been wound up. In the best tradition of the metes-and-bounds legal descriptions in land surveys, we find ourselves back at the place of beginning.

(1956)). And of course, the Findings and Conclusions and resulting judgment have fully resolved the dispute between two of the parties, Shackets and Philko. *Dimmitt & Owens Financial, Inc. v. United States,* 787 F.2d 1186, 1189 (7th Cir.1986).

That then calls for this Court's "determination that there is no just reason for delay" (Rule 54(b)), a determination that calls for consideration of "judicial administrative interests as well as the equities involved," *Curtiss-Wright,* 446 U.S. at 8, 100 S.Ct. at 1465. It takes only a brief review of the relevant factors identified in *United States General, Inc. v. Albert,* 792 F.2d 678, 681 & n. 3 (7th Cir.1986) to show all of them point to an affirmative answer:

1. As for the "relationship between the adjudicated and unadjudicated claims," this opinion has already shown why appeal of the Shackets-Philko claim is *essential* to resolution of the unadjudicated Shackets-Clark-Rittenhouse claim. Conversely, there is no realistic way in which the latter claim can be resolved until the former is played out to the end.

2. There is no way in which future developments before this Court (now limited to the Shackets-Clark-Rittenhouse dispute) could moot the Shackets-Philko claim.

3. Once the Court of Appeals reviews the issues between Shackets and Philko, the same issues would not have to be considered a second time in any review of the Shackets-Clark-Rittenhouse dispute. Quite the contrary, resolution of the former issues is really a precondition to the latter.

4. No possible setoff is involved, because the parties are different.

5. None of the "miscellaneous factors" identified in *United States General* militates against the present appeal.

Even on the sound premise that a Rule 54(b) determination "should be used only in an exceptional situation" (*Glidden v. Chromalloy American Corp.,* 808 F.2d 621, 624 (7th Cir.1986)), this case qualifies.

Accordingly this Court determines expressly there is no just reason for delay with respect to the Shackets-Philko disputes. It expressly directs the entry of a final judgment on the previously-entered order that immediately followed the Findings and Conclusions, an order that has completely and finally disposed of the claims as between Shackets and Philko.

## ON MOTION TO DISMISS

On November 20, 1986 this Court issued its Findings of Fact and Conclusions of Law in favor of Maurice and Sylvia Shacket (collectively "Shackets") and against Philko Aviation, Inc. ("Philko"). After that ruling, the parties called this Court's attention to the dormant third-party complaint Shackets had previously filed against Clark Aviation, Inc. and Kenneth Rittenhouse (collectively "Clark-Rittenhouse"). Pendency of that claim necessitated the issuance of a Fed.R.Civ.P. 54(b) determination on the Shackets-Philko dispute, to confer finality on this Court's decision and thus enable Philko to appeal. This Court made such a determination December 29, 1986.

 Clark-Rittenhouse have moved to dismiss Shackets' claim against them. But that claim seeks not only indemnification against any possible liability Shackets might owe Philko (a possibility extinguished by this Court's ruling against Philko, unless that decision were reversed on appeal) but also for the damages (including attorneys' fees) Shackets have sustained by becoming embroiled in litigation with Philko. *Sorenson v. Fio Rito,* 90 Ill.App.3d 368, 371–74, 413 N.E.2d 47, 51–53 (1st Dist. 1980) gives a thoughtful explanation of why a claim such as that advanced by Shackets against Clark-Rittenhouse does not violate the "American Rule" prohibiting the recovery of attorneys' fees by a successful litigant. In this case, as in *Sorenson,* the attorneys' fees Shackets seek to recover are ordinary damages and not merely the costs of litigation.

Accordingly the Clark-Rittenhouse motion to dismiss Shackets' third party complaint is denied. This case is set for a status hearing January 29, 1987 at 9:15

a.m. to discuss the future proceedings on that claim.