**CLEVELAND HAIR CLINIC, INC., Plaintiff,**

v.

**Carlos J. PUIG, et al., Defendants.**

**No. 96 C 3560.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 20, 1996.

---

Alan S. Rutkoff, McDermott, Will & Emery, Chicago, IL, for Plaintiff.

Tomas Brejcha and Juris Kins, Abramson & Fox, Chicago, IL, for Dr. Carlos Puig and Puig Medical Group, S.C.

Thomas Ging, Hinshaw & Culbertson, Chicago, IL, for Dr. Haenschen.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Cleveland Hair Clinic, Inc. ("Cleveland Hair") has moved for partial summary judgment under Fed.R.Civ.P. ("Rule") 56 in this action as to Count I of its Amended Complaint: Cleveland Hair's claim that Puig Medical Group, S.C. ("Puig Group") breached the October 1, 1993 agreement between the parties ("Agreement") by Puig Group's notice of termination served on May 24, 1996[1] to become effective 30 days later ("Notice"), and Cleveland Hair's related claim that Dr. Carlos Puig ("Puig") had breached his duties as its then Medical Director. At this point the Cleveland Hair motion is fully briefed and ready for decision. In that respect, because this war by litigation (a term used advisedly) was being waged on several fronts simultaneously, the issuance of this Court's October 22, 1996 memorandum opinion and order dealing with sanctions ("Sanctions Opinion") has also impacted materially on the motion.

When Cleveland Hair filed its motion it relied in principal part on two uncontroverted facts:

1. Puig Group's Notice had stated as its *sole* ground for termination of the Agreement the fact that the parties had not reached an understanding on certain matters relating to malpractice liability insurance, for which purpose the Notice pointed to a reserved right of termination contained in an October 1, 1993 letter agreement between the parties ("Letter") executed contemporaneously with the Agreement and stating in relevant part (emphasis added):

> It is hereby agreed that for a period of six (6) months from the date of this letter, CHC and PMG shall act in good faith to negotiate an agreement with respect to the payment of a tail insurance policy for the benefit of Carlos J. Puig, D.O., upon the expiration or termination of the Agreement under certain circumstances.

---

1. All further dates referred to without a year designation will also denote 1996 events.

If at the end of this six (6) month period CHC and PMG have not reached an agreement with respect to the payment of the tail insurance policy, either CHC or PMG may terminate the Agreement upon thirty (30) days prior written notice to the other party. *An election by CHC or PMG to terminate the Agreement based upon a failure to reach an agreement with respect to the payment of the tail insurance policy shall not be deemed to be a breach of, or a default under, the Agreement.*

This side letter of agreement represents the entire agreement and understanding between CHC and PMG with respect to the payment of a tail insurance policy, and supersedes all prior discussions and understandings with respect thereto. This side letter of agreement may not be modified or amended except in a writing signed by CHC and PMG.[2]

2. But when Puig was deposed on the subject of the Notice, here is what he said (Dep. 80):

Q: So I take it during this time period from when you began the deliberative process[3] until the time of your notice, you had no discussions with any of the people associated with Cleveland Hair Clinic regarding malpractice tail insurance, did you?

A: No.

Q: And malpractice tail insurance really didn't have anything to do with the reason why you were leaving, did it?

A: Well, no.

And Puig Dep. 129–31 confirmed that the malpractice insurance issue was not at all a continuing point of contention between Cleveland Hair and Puig, but that it had instead been placed on the shelf quite some time earlier as an inactive unresolved matter—one on which the parties had never reached an impasse—while the parties went about the more important business of carrying on their business activity of providing hair transplant services.

Hence Cleveland Hair takes the position that the Notice did not comply with the express terms of the Letter, because it was not really "based upon a failure to reach an agreement with respect to the payment of the tail insurance policy"—and that Puig himself had unequivocally confirmed that to be so. Cleveland Hair further invokes the "mend the hold" doctrine of Illinois law[4] to foreclose Puig Group from shifting the ground that it had staked out in the Notice to some other or additional ground that would justify termination as a matter of law, even though such other or additional ground would not conform to the express limitation contained in the Letter (nor would it conform, then, to what was actually said in the Notice).

In response to the Cleveland Hair Rule 56 motion, Puig Group filed its required General Rule ("GR") 12(N) statement[5] that set out two purported responses relevant to Cleveland Hair's contention:

1. Puig Group GR 12(N) ¶ 11 admitted the indisputably limited content of the Notice. But it went on to say that Cleveland Hair's purported "engagement in improper

**2.** [Footnote by this Court] As stated in the text, there is no ambiguity whatever as to Puig Group's sole reliance on that October 1, 1993 letter as the predicate for termination of the Agreement. Puig Group's May 24 Notice is attached as Ex. 1 to this opinion, and its second paragraph expressly confirms that reliance.

**3.** [Footnote by this Court] That reference to "deliberative process" stemmed from Puig's earlier testimony as to the time that he began to counsel with his attorneys about what he and they considered to be his "options," including termination of the Agreement—a date that he placed at about March 1 (Dep. 75, 76–77, 78–79).

**4.** From here on out that doctrine will be referred to without quotation marks.

**5.** This District Court has designed GR 12 to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. GR 12(M) requires a Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of those facts (a provision with which Cleveland Hair complied). Then GR 12(N) (with which Puig Group complied) requires the nonmoving party to respond point by point, with citations to the record in support of (1) any claimed disputes as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert.

fee-splitting arrangements was an additional ground for termination," citing some record references in proposed support of that characterization.

2. Puig Group GR 12(N) ¶ 14 "denied" the Cleveland Hair GR 12(M) ¶ 14 statement that:

> Puig's [Cleveland Hair's GR 12(M) statement used that name to denote Puig Group] termination was not based on the parties' failure to reach agreement on malpractice liability insurance.

But it is a truism that only *evidence* is to be considered as the basis for the granting or denial of a summary judgment motion (Rule 56(c) and (e)), and the function of GR 12(M) and (N) statements is not to provide evidence in and of themselves, but rather to *identify* the record evidence that demonstrates the existence or nonexistence of genuine issues of material fact. And the only *evidence* that Puig Group cites for its claimed "denial" of the Cleveland Hair GR 12(M) ¶ 14 statement (which was itself grounded in Puig's unequivocal admission) is a reference to Puig Dep. 98. Yet here is all that Puig's testimony reflects at that point (Dep. 98 line 3 to 99 line 9):

> Q: And at the time you made that decision—strike that.
>
> As of the time the notice was made, you obviously had knowledge about all of the things that you said led to your decision?
>
> A: That's right.
>
> Q: This—
>
> A: Let me point something out here, if I may.
>
> Q: Sure.
>
> A: I know this is not good form—
>
> Q: Fine.
>
> A: —in a deposition.
>
> Q: I will tell you when the form gets bad.
>
> A: Well, I preferred, to be honest with you, I preferred to terminate on the grounds of the side letter [the Letter] because I didn't want to bring the dirt up of the fee splitting if I didn't have to because

I wanted to preserve—I didn't want to—within this small industry that we have, okay, I didn't want to in some way have the fee-splitting issue leak out and undermine the ability of CHC to make other contracts in the future with other physicians who might be able to help them to continue on.

> Q: So that was a conscious decision on your part?
>
> A: That was a conscious decision on my part to, if we could, terminate the relationship without throwing mud and undermining the ability of CHC to continue on without PMG. I would prefer to have taken that course rather than the one that we're describing now.

So it is plain that Puig Group's purported denial is not at all supported by the evidence, and Puig's own testimony unambiguously confirms (as Cleveland Hair GR 12(M) ¶ 14 states) that he based the Notice on the asserted breach of the Letter, even though that really had nothing at all to do with Puig Group's attempted termination of the Agreement. That is the true matrix in which this Court is called upon to deal with Cleveland Hair's current motion. And as the ensuing analysis shows, in terms of that matrix Cleveland Hair prevails from several independent perspectives.

To begin with, although the parties have devoted the principal part of their research and memorandum efforts to discussion of the mend the hold doctrine,[6] it should be emphasized that application of that doctrine is not at all a precondition to Cleveland Hair's success under Rule 56. As a matter of straight contract analysis, any termination notice that relied on the Letter as the source of Puig Group's right to terminate the Agreement *had* to be "based upon a failure to reach an agreement with respect to the payment of the tail insurance policy." But on Puig's own admission the Notice was *not* so based. This situation is really no different from one in which a landlord serves a notice of lease termination that says it is based on the ten-

---

**6.** This is not said by way of criticism. This Court is itself the one that first called counsel's attention to the doctrine, and under the circumstances they would have been imprudent in representing their clients if they had failed to pursue that line of inquiry.

ant's failure to maintain the premises when that is not the actual reason for termination—and then, after having admitted that the condition of the premises had nothing to do with the termination, the landlord then seeks to urge that some rent was unpaid at the time of the notice and that such unpaid rent would have justified the previously-served termination notice. Having chosen to designate a stated basis for termination that was not in fact the reason for its action, Puig Group cannot now retrospectively salvage its admittedly ineffective notice.

■ Thus Cleveland Hair necessarily prevails on its Rule 56 motion without any need for this Court to delve into the applicability or inapplicability of the legal mend the hold doctrine. By its own terms its Notice was ineffective as a termination of the Agreement, and that in turn means that the steps that Puig Group has taken in implementation of and following the Notice have been equally ineffective. Puig has likewise breached his obligations as Cleveland Hair's Medical Director by his utilization of the invalid Notice as a vehicle for implementing his departure from Cleveland Hair. But because the current motion is limited to seeking partial summary judgment only, and because to this point the parties have not really addressed the legal consequences of those breaches by Puig Defendants,[7] this opinion will not go on with the analysis of that subject.

It should also be understood that this opinion will not address, because it has no occasion to do so, such other questions in connection with the parties' relationship as:

1. whether Puig Group can, if it so elects, hereafter serve a new and valid notice of termination that is actually based on the parties' failure to reach agreement on the malpractice insurance issue or whether instead, as Cleveland Hair urges, the conduct of the parties and the passage of time have rendered the Letter ineffective as a prospective ground for termination now or at any time hereafter;[8] or

2. whether under the Agreement Puig Group can terminate the relationship between the parties, at some time before the Agreement's stated expiration date in the year 2003, on the ground that Puig now claims constituted his actual reason for termination (even though if he is to be believed, he deliberately omitted it from the Notice).

Answers to either of those questions would represent impermissible advisory opinions in the present context of the case (even apart from Puig Defendants' contention that it would be inappropriate for this Court to address the first of those questions now—see their October 29 Supplemental Memorandum).

Having said all of that, however, this opinion does go on to cover two other grounds that upon examination turn out to call for the identical conclusion. Those two grounds, each of them independent of the earlier analysis and each independent of the other, stem from the recently concluded sanctions proceedings in this action and from the already-mentioned mend the hold doctrine.

For one thing, this Court's Sanctions Opinion, which held that sanctions should be imposed against Puig Defendants (as well as others) for reasons spelled out in great detail there, held in part that the improprieties referred to in the Sanctions Opinion call for limiting Puig Group to reliance on the *expressly stated* ground for termination set out in the Notice, and for not permitting Puig Group to invoke any other claimed ground. Sanctions Opinion at 16–17 said that such a limitation "amounts to nothing more than requiring them to keep their word—having chosen to sever their relationship with Cleveland Hair for one asserted reason, they ought in fairness to be held to that reason as the sole ground for termination." And Sanctions Opinion, *id.* at 17 (footnote omitted) went on to say:

It may perhaps be odd to regard that requirement as a "sanction"—simply hold-

---

7. This is a collective term used in this opinion to refer to Puig *and* Puig Group.

8. In that respect Cleveland Hair's counsel has colorfully observed that the Letter is not a "get

out of jail free" card, available for use at any time during this litigative equivalent of a Monopoly game.

ing a party to the stance that it has voluntarily taken—but under the circumstances as they have been developed in this case, it is no more than fair. Accordingly the "sanction" in that respect will simply be to foreclose Puig Defendants from urging any basis for the contract's termination other than the one that they themselves chose as the sole ground for their notice of termination, without regard to any technical or other limitations on the applicability of "mend the hold" as a legal doctrine. This lawsuit will proceed on that premise, so that the validity or invalidity of Puig Defendants' termination notice will be determined solely in terms of the validity or invalidity of their own asserted ground for termination.

As already stated, an analysis in those terms inexorably leads to the same destination that this opinion has already marked out.

■ As for the mend the hold doctrine itself, this Court has elsewhere dealt with that concept in a number of published opinions beginning in 1986,[9] while our Court of Appeals has also picked up on and applied the doctrine on a number of occasions (see, most recently *Horwitz–Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1251–52 (7th Cir.1996)). But Puig Defendants urge that the Illinois doctrine does not support the conclusion that Cleveland Hair seeks to draw from it, pointing for that purpose to certain of the Illinois cases applying the doctrine.

To be sure, as with every issue in a diversity case the substantive doctrines under Illinois law are a function of what the Illinois cases teach, not necessarily what federal courts have said about those teachings.[10] But in this instance there is no real divergence in that regard. Thus the most recent of the Illinois cases, *Israel v. National Canada Corp.*, 276 Ill.App.3d 454, 462–63, 213 Ill.Dec. 163, 170–71, 658 N.E.2d 1184, 1191–92 (1st Dist.1995) (a decision cited and relied upon in *Horwitz–Matthews*) states the mend the hold principles succinctly in a fashion that confirms their applicability to bind Puig Defendants here (citations omitted, emphasis added):

> Under Illinois law, a party may justify an asserted termination, rescission, or repudiation of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later. *Illinois law requires a defendant in a breach of contract claim to stand by the first defense raised after the litigation has begun.*[11] However, the law does not require that the defense be asserted at the time the contract is terminated. Ordinarily the party terminating the contract need not explain his reason at the time of termination, providing that some legally adequate reason exists. If the legal excuse for non-performance exists at the time of termination, the terminating party may rely on the excuse in a breach of contract action even though he was unaware that the excuse existed at the time he terminated.

As their first filing after Cleveland Hair brought this action challenging the validity of Puig Group's termination of the Agreement via the Notice, Puig Defendants filed not an

---

**9.** Although this Court, keenly aware of the doctrine from its days as a practitioner, has been calling the same principle to lawyers' attention orally for a long period of time, its first published opinion that shows up in a Westlaw search is *Shacket v. Roger Smith Aircraft Sales, Inc.*, 651 F.Supp. 675, 695 (N.D.Ill.1986). That same printout has turned up seven other published opinions by this Court during the decade between *Shacket* and this case.

**10.** This Court recognizes that our Court of Appeals has left open, in *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362–64 (7th Cir.1990) and later cases, the question whether mend the hold principles are to be viewed as substantive or procedural (or as something of each) for *Erie v. Tompkins* purposes. This opinion will proceed on the former premise, which appears to be the general thrust of the use of the doctrine by our Court of Appeals (usually speaking through now Chief Judge Posner). But even were that not the case this opinion would come out the same way, in part because the federal case law discussions of the doctrine do not teach a different lesson from that in *Horwitz–Matthews* and in part because mend the hold is just another (and not an essential) string to Cleveland Hair's bow.

**11.** [Footnote by this Court] This particular aspect of the doctrine, which is of major importance in its application to this case, did not show up in *Horwitz–Matthews*. But that was because the issue posed here was not involved there.

answer but rather an Emergency Motion for Temporary Restraining Order and Preliminary Injunction. Then when that effort proved unsuccessful, Puig Defendants promptly filed a Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Motion") and, a few days later, an Answer and a separate Counterclaim. *Every one* of those pleadings relied solely on the Notice, with its exclusive reliance on Cleveland Hair's claimed breach of the Letter, as the *only* basis for termination of the Agreement.

Thus in the Emergency Motion Puig Defendants referred *only* to the Letter as giving Puig Group a right to terminate the Agreement (Emergency Motion ¶ 8 and Ex. B) and referred to Puig Group having served the Notice on Cleveland Hair (Emergency Motion ¶ 9)—with not a word being said about any other reason having been the ground (or even *a* ground) for the termination. Then the TRO Motion and thereafter the Answer and the Counterclaim all reconfirmed Cleveland Hair's claimed breach of the terms of the Letter as having been the sole basis for termination of the Agreement via service of the Notice (TRO Motion ¶¶ 8–14 and Ex. F, Answer ¶ 31[12] and Counterclaim ¶¶ 11–17 and Ex. F). Both the TRO Motion and the Counterclaim (not the Answer) did advert for the first time (as the Emergency Motion had not done) to other assertedly improper conduct by Cleveland Hair as constituting a breach of the Agreement and as a potential basis for its termination (TRO Motion ¶¶ 15–20 and Counterclaim ¶¶ 23–28), but *neither* of those pleadings even purported to say that such conduct had been a predicate for the termination via the Notice. On the contrary, each of them confirmed that the assertedly improper conduct was known to Puig Defendants two weeks *before* the No-

tice was served (TRO Motion ¶¶ 15–16 and Counterclaim ¶¶ 23–24), but that such conduct was not sought to be included in the later-served Notice.

When thus laid alongside the *Israel* mend the hold formulation, that course of conduct by Puig Defendants fits precisely into the situation that *Israel* identifies as calling for application of the rule:

> Illinois law requires a defendant in a breach of contract claim to stand by the first defense raised after the litigation has . begun.

Totally unlike the situation that was pointed to by contrast in *Israel,* the terminating party (here Puig Group) was fully *aware* that another claimed legal excuse for nonperformance existed at the time that it served its notice of termination, but it did *not* rely on that claimed excuse either in the notice of termination or in the first defense that it raised in this litigation. Thus this third route—the one that prohibits a party from mending its hold—also terminates at the same destination as the two routes previously discussed.

### Conclusion

There is no genuine issue of material fact (that is, any fact that is outcome-determinative—see *Pritchard v. Rainfair, Inc.,* 945 F.2d 185, 191 (7th Cir.1991)), and Cleveland Hair is entitled to a judgment as a matter of law as to the invalidity and ineffectiveness of Puig Group's Notice to have terminated the Agreement. That being the case, the Agreement remained in full force and effect, and all of the subsequent conduct of Puig Defendants and others that has been at odds with the Agreement is equally ineffective. This Court will await the input of the parties as to the appropriate implementation of this grant

---

**12.** Amended Complaint ¶ 31 alleged:

> The term of the CHC/Puig Corporation Agreement extends to the year 2003 and the agreement is not subject to unilateral termination by Puig Corporation. The May 24 termination notice purports to be given pursuant to a side letter of agreement between CHC and Puig Corporation that was entered at the same time as the CHC/Puig Corporation Agreement to address one unresolved issue involving liability

> insurance. A copy of this letter agreement, referred to hereafter as the "Side Agreement," is attached as Exhibit 2.

And *tellingly* Puig Defendants Answer ¶ 31 responded this way (emphasis added):

> The first sentence of paragraph 31 is denied. The second sentence is admitted and *defendants affirmatively state that the termination notice was, in fact, and not just "purportedly" pursuant to the side letter of agreement.*

of partial summary judgment on Cleveland
Hair's Amended Complaint Count I.

EXHIBIT I

Since 1973

*Puig Medical Group*

24 May 1996                           Via FAX & Hard Copy

Victor A. Leonhard, President         Jack L Libert, Esq., Secretary
Cleveland Hair Centers               377 Oak Street
700 Brintons Bridge                  PO Box 739
West Chester, PA 19382               Garden City, NY 11530
FAX: 610-793-2057                    FAX: 516-745-1089

Cleveland Hair Clinic, Inc.
1937 North Cleveland Massillon Road
PO Box 1267
Bath, OH 44210

Gentlemen,

Please accept this letter as notice of the termination of that certain agreement
dated October 1, 1993, by and between CLEVELAND HAIR CLINIC, INC. and
PUIG MEDICAL GROUP, SC.

Given the failure of CHC, Inc. and my company to reach an agreement with
respect to the tail insurance policy issues, I have chosen to exercise my right to
terminate the October 1 agreement pursuant to the terms of the side letter of
agreement executed between us the same date.

In accordance with the intent of our October 1 agreement, PUIG MEDICAL
GROUP, SC., expects that CLEVELAND HAIR CLINIC, INC., for a period of 30
days from this notification, will continue to provide the nursing, administrative,
and business professional services required by PUIG MEDICAL GROUPS
various operations nationwide, with the express understanding that any and all
management fees due pursuant to the terms of the now terminated agreement
would be properly satisfied in a timely fashion on completion of the final audit,
in accordance with the terms of paragraph 6 of the agreement.

Effective immediately, kindly forward all PUIG MEDICAL GROUP, PC.
documents to my attorney, Stephen J. Schostok of the firm Di Monte Schostok &
Lizak, 1300 West Higgins Road Suite 200, Park Ridge, IL 60068, inclusive of any

**Physicians Hair Replacement Center**
*4635 Southwest Freeway, Suite 182W • Houston, TX 77027*
*(713) 629-0740 • (800) 882-7472 • Fax. 713-629-0211*

*Since 1973*

## *Puig Medical ♀ Group*

and all contracts, state licenses, insurance and financial documents. With a view to facilitating an orderly windup of the inter-company relationship, I would like to suggest a meeting in the offices of my attorneys in Park Ridge, Illinois Tuesday afternoon, May 28, 1996, at 2:00 PM. To that end, kindly telephone my counsel at 847-698-9600 to confirm your availability and willingness to attend a meeting on that date and time.

Sincerely,
Puig Medical Group, SC

By: _____
Carlos J Puig D.O.
President

 **Physicians Hair Replacement Center**
*4635 Southwest Freeway, Suite 182W • Houston, TX 77027*
*(713) 629-0740 • (800) 882-7472 • Fax: 713-629-0211*